## PROMISSORY NOTE
## AND LOAN AND SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower") promises to pay to the order of Westlake Flooring Company, LLC ("Lender"), with its principal office at 4751 Wilshire Blvd., Suite 100, Los Angeles, CA 90010, or such other place as Lender may designate in writing or on the Westlake Portal from time to time, the principal sum of FIVE HUNDRED THOUSAND DOLLARS ($500,000), or such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time, together with all costs, interest, fees, and expenses as provided for under this Note and the other Loan Documents. Unless otherwise stated in an addendum to this Note, this Note shall become effective on the date of Borrower's execution hereof as set forth below (such date, or the effective date otherwise stated in the applicable addendum, the "Effective Date").

NOW, THEREFORE, in consideration of the mutual covenants, agreements and conditions contained herein, Borrower and Lender (each, a "Party" and collectively, the "Parties") agree as follows:

1. DEFINITIONS. Capitalized terms used in this Note or in the other Loan Documents without definition shall have the respective meanings as set forth in Appendix A attached hereto and incorporated herein by reference (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein or in another Loan Document, but not otherwise defined herein or in such other Loan Document, as the case may be, shall have the meanings ascribed to them in the UCC.

   a. Pledge of Collateral. Borrower grants to Lender a continuing security interest in all of Borrower's assets and properties, wherever located, including, without limitation, all equipment of any kind or nature; equipment, fixtures, goods; all vehicles and vehicle parts; all Inventory now owned or hereafter acquired, wherever located, including, without limitation, all Lender Financed Inventory now owned or hereafter acquired; all amounts in Borrower's Reserve held by or on behalf of Lender, if any; all documents, documents of title, deposit accounts, accounts receivable, manufacturer rebates and incentive payments, chattel paper, including, without limitation, all Receivables and general intangibles now owned or hereafter acquired by Borrower; all cash reserves; all of Borrower's books and records (including any books and records contained on computer hardware or software or otherwise stored by or on behalf of Borrower in electronic or digital form); and all additions, accessions, accessories, replacements, substitutions, and proceeds of any of the foregoing (collectively, the "Collateral").

   b. Further Assurances. The security interest given to Lender in Section 2(a) is given to Lender to secure payment of all Liabilities and the performance of all obligations of Borrower to Lender, under this Note, under any other Loan Document, or otherwise, all without relief from valuation or appraisement Laws. Upon the request of Lender, Borrower shall promptly execute and deliver to Lender or its designee such further documents and instruments, and shall take such further actions, in each case as Lender may deem necessary or desirable to protect Lender's interest in the Collateral or otherwise effectuate the provisions of this Note and the other Loan Documents. Without limiting the generality of the foregoing, Borrower shall, upon the request of Lender, (i) use its best efforts to secure all consents and approvals that may be necessary or appropriate for the assignment to Lender of any Collateral (including any contract of Borrower that constitutes any portion of the Collateral), or that may be necessary in order for Lender to receive the full benefit of all Collateral and to enforce its

Initials ___

security interest in the Collateral; (ii) provide Lender and its Representatives with full access to all Collateral, including any and all books and records relating thereto; and (iii) deliver to Lender all Collateral consisting of negotiable documents, chattel paper, and instruments not deposited for collection in the aggregate (in each case, accompanied by any related bills of sale or any other instruments of transfer executed for Borrower), in each case promptly after Borrower receives the same.

c. <u>Financing Statement</u>. Borrower authorizes Lender to file any UCC financing statements and any amendments thereto and any continuation statements under the UCC, in each case to the extent necessary or desirable to effect or preserve the security interest granted by Borrower hereunder or under any other Loan Document. Further, Borrower hereby acknowledges, ratifies and approves any UCC financing statements or other filings under the UCC that may have been made by or on behalf of Lender and its Affiliates prior to the Effective Date. The security interest granted by Borrower in Section 2(a) shall be in addition to, and not a substitution for, any right of offset, netting, or reclamation that Lender may have against Borrower, whether pursuant to this Note, any other Loan Document, or any Law.

2. INTEREST RATE. Interest shall accrue on Borrower's Liabilities to Lender in accordance with the following schedule:

a. <u>Interest Calculation</u>. All outstanding Liabilities relating to an Advance shall accrue Interest on a per annum basis from the Floorplan Date, based upon a 360-day year, and such Interest shall be compounded daily at the Base Rate, plus the Contract Rate, in each case as stated on the applicable Fees and Rate Schedule, until such outstanding Liabilities are paid in full.

b. <u>Base Rate</u>. The Base Rate may be amended or modified by Lender from time to time in Lender's sole discretion by posting such amendment or modification of the Fees and Rates Schedule on the Westlake Portal or otherwise communicated to Borrower in writing.

3. BORROWER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS. At the time of Borrower's execution of this Note and continuing at all times thereafter until all Liabilities have been indefeasibly paid and satisfied in full and this Note and all other Loan Documents terminated in accordance with their respective terms, Borrower hereby represents, warrants, covenants, and agrees:

a. <u>Use of Proceeds; Restrictions</u>. To exclusively use Floorplan Advance proceeds to purchase Lender Financed Inventory from auctions or third party businesses who have entered into a Third Party Funding Agreement with Lender, consistent with Borrower's Ordinary Course of Business and in accordance with Law.  Such Lender Financed Inventory shall not be for personal, family, or household use, and shall be solely used for retail sale and not for lease, rent, or demonstration purposes, and shall exclude salvage units, wrecked units, inoperable units, flood-damaged units, personal watercraft, Canadian imports, gray market cars, motorcycles, scooters, trailers, kit cars, snowmobiles, wreckers, ATVs, limousines, RVs, buses, boats, collector or classic cars, golf carts, vehicles valued less than $3,000 per Manheim Market Report (MMR), or vehicles twenty (20) years or older, and not to sell or otherwise dispose of any Lender Financed Inventory except as herein provided.

b. <u>Location; Consignment</u>. To keep Lender Financed Inventory only at Borrower's Place of Business and not to remove any Lender Financed Inventory from such place, unless previously authorized in writing by Lender. Notwithstanding the foregoing, Borrower may request Lender's

Initials____

to authorize Borrower to consign certain Lender Financed Inventory to another licensed dealer at such consignee dealer's place of business. Borrower's request to consign Lender Financed Inventory as referenced above is subject to Borrower and the consignee dealer executing and delivering to Lender any documentation that Lender may require, including a UCC financing statement and related and required documents, or an authorization for Lender to make any such filing and make any related and required documents. Lender may deny Borrower's request to consign Lender Financed Inventory in Lender's sole and absolute discretion.

c. <u>Insurance</u>. To keep Lender Financed Inventory in good repair and insured against all physical risks in such amounts and under such policies issued by such insurance companies as are deemed necessary and satisfactory by Lender, pursuant to the Insurance Requirements set forth in **Exhibit D** attached hereto. Such requirements include, but are not limited to, comprehensive insurance, collision insurance, garage insurance, each satisfying the required insurable and deductible amounts, naming Lender as the loss payee, and satisfying all rating and class requirements. Borrower shall provide Lender with a certificate or certificates of insurance evidencing that the above-mandated insurance requirements have been satisfied and specifying that the applicable insurance carriers will mail direct written notice to Lender at least thirty (30) days prior to any cancellation or non-renewal of any of the above-mandated policies. Alternatively, and unless the Unit of Lender Financed Inventory is ineligible for the Inventory Protection Program, Borrower may satisfy the insurance coverages required under this Section 4(c) by voluntarily enrolling in Lender's Inventory Protection Program.

In the event Borrower fails to procure, maintain or provide proof of the insurance coverages required under this Section 4(c), Lender may (but shall be under no obligation to do so) enroll Borrower in Lender's Inventory Protection Program, or, alternatively, Lender may secure on Borrower's behalf such policies of insurance as Lender, in its sole discretion, deems necessary, in each case from such insurers, in such amounts and with such coverages and deductibles as Lender, in its sole discretion, deems necessary. Charges incurred under the Inventory Protection Program are calculated as of the Floorplan Date from the amount of each original Floorplan Advance related to a Unit of Lender Financed Inventory, through the life of the Floorplan Advance unless and until Borrower provides evidence that it has complied with the Insurance Requirements under this Note and the other Loan Documents, at which point Borrower's charges under the Inventory Protection Program shall cease from the date that Lender receives, to Lender's own satisfaction, evidence of such compliance. Borrower understands and agrees that Lender has an insurable interest in the Collateral, including all Lender Financed Inventory, by virtue of Borrower's pledge of the Collateral as security to Lender for the repayment of all Liabilities by Borrower to Lender under this Note and the other Loan Documents. Fees for the Inventory Protection Program are published in the Fees and Rates Schedule. All sums disbursed by Lender, including, without limitation, fees, costs, expenses and other charges relating thereto, in order to obtain or maintain insurance required under this Note and the other Loan Documents shall be payable, on demand, by Borrower to Lender and shall be additional indebtedness due to Lender under this Note and the other Loan Documents and be secured by the Collateral.

d. <u>Records</u>. To keep at all times complete and accurate records of Borrower's Business and to promptly (but in any event within two (2) Business Days) provide to Lender copies of such records and any financial information regarding Borrower's Business or Borrower's financial condition generally, in each case as Lender may request. Borrower authorizes Lender to share such information and any and all other information that Lender may possess regarding Borrower's Credit Line or Borrower's relationship with Lender, including information

Initials_____

regarding this Note and the other Loan Documents; Borrower's loan history; account history; payment history; audit history; account balance; loan application; credit worthiness; credit availability; and such other general business information regarding Borrower's Credit Line and Borrower's relationship with Lender, to any and all Persons that Lender, in its sole discretion, deems reasonable, including auctions. Without limiting the generality of the foregoing, Borrower shall maintain complete and accurate records and financial statements for all Advances requested or made hereunder, and all other transactions hereunder, including bank statements, cancelled checks, sales invoices, proofs of payment, and other sales files, in each case for at least a period of five (5) years after the date on which such Advance was made or such transaction occurred, as the case may be.

e. <u>Amounts Received; Advance Payoff</u>. To hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for such Unit of Lender Financed Inventory, which in each case shall be payable on the Maturity Date.

f. <u>Affirmation of Compliance</u>. That any request for an Advance shall constitute an affirmative representation by Borrower to Lender that Borrower is in full compliance with all terms, conditions, representations, warranties and covenants made under this Note and the other Loan Documents, in each case as of the date of such request.

g. <u>Financial Condition</u>. That Borrower now has, and will have all the time of any Advance and through the date of any repayment of the Liabilities thereunder, (i) sufficient cash and equity capital to conduct its Business and pay its debts as they mature; (ii) sufficient capital and other financial resources necessary to engage in the Business and perform its obligations under any agreement to which it is a party and any transaction in which it may engage hereafter; and (iii) ownership of property (including property of all wholly-owned and partially-owned subsidiaries of Borrower) having an aggregate fair market value that is greater than the sum of Borrower's debts (which shall include debts of all wholly-owned and partially-owned subsidiaries of Borrower).

h. <u>Distributions</u>. That, without Lender's prior written consent (which consent may be withheld by Lender in its sole discretion), Borrower shall not (i) make any distributions of its property or assets (including any cash), except for tax and other distributions that (A) are made in the Ordinary Course of Business and, (B) are made in compliance with all Laws, and (C) will not render Borrower or any of its Affiliates insolvent, or otherwise impair the ability of Borrower or any of its Affiliates to satisfy their respective financial obligations when and as such obligations become due; (ii) sell, issue, redeem, retire, purchase, or otherwise acquire, directly or indirectly, any of its capital stock or other equity, in any manner which would reduce, in the aggregate and on a cumulative basis, either the cash position or "tangible net worth" of Borrower (as defined in accordance with United States generally accepted accounting principles) by more than ten percent (10%); (iii) make any material change in its capital structure, or make any material change in its Business or operations; (iv) make any loans or other advances of money or any loans or advances of Inventory or other property to any Person, including any officer, director, stockholder, employee, or Affiliate of Borrower, other than (A) advances against commissions, and other similar advances to employees in the Ordinary Course of Business, and (B) loans not exceeding an aggregate of two percent (2%) of the Credit Line; (v) undertake or permit any of its equity holders to undertake any transaction or series of transactions that would result in the equity holders of Borrower, as of the

Initials___

the Effective Date, owning and controlling less than seventy-five percent (75%) of all classes of the outstanding equity of Borrower on a fully-diluted basis; or (vi) engage in any transaction or series of transactions to sell, liquidate, or otherwise transfer, all or substantially all of its assets. If Borrower desires to engage in any transaction or series of transactions that would, absent the written consent of Lender, be prohibited under this Section 4(i), Borrower shall provide Lender with no less than thirty (30) days' prior written notice describing the proposed transaction or series of transactions in reasonable detail, and Lender may, in its sole discretion, consent in writing to such transaction or series of transactions, as the case may be. For purposes of clarity, in no event shall any failure to respond by Lender be construed as acceptance or acquiescence to any transaction or series of transactions hereunder, or any waiver by Lender with respect to any transaction or series of transactions prohibited under this Section 4(g).

i.  <u>Payment of Obligations</u>. To pay immediately and to remain current with all levied taxes, assessments, charges, judgments, and expenses which may now or hereafter be entered, levied, or assessed against Borrower, Borrower's Business or any other business in which Borrower may be involved, and/or any of the Collateral. Lender may, in its sole discretion, make an Advance to a third party on Borrower's behalf to pay such taxes, assessments, charges, judgments, and expenses to protect Lender's interests, and may thereafter collect the amount of any such Advance, together with any associated costs and expenses of Lender, from Borrower as an Administrative Charge pursuant to the terms of this Note.

j.  <u>Licensing, Registration, etc</u>. That Borrower has obtained all necessary permits and licenses required by Law to operate its Business as a wholesale or retail seller, lessor, or renter of Inventory, and that Borrower has complied with all filing requirements to operate as the entity or business type on record with the appropriate governmental office(s).

k.  <u>No Proceedings</u>. That no legal, administrative, or arbitration proceedings are pending or threatened against Borrower which could reasonably affect Borrower, its Business or any Collateral, or which could materially and adversely affect any other business of Borrower or any properties or prospects, or the general condition, financial or otherwise, of Borrower, or Borrower's ability to repay all Liabilities and otherwise meet its obligations under this Note and the other Loan Documents.

l.  <u>Notice of Proceedings</u>. That Borrower shall immediately notify Lender in writing of any tax warrant, tax levy or any legal, administrative, or arbitration proceedings to which Borrower becomes a party after the Effective Date.

m.  <u>Sufficient Funds</u>. That all payments made by Borrower to Lender via check or ACH, at the time of issuance, will be written or drawn upon an account that contains immediately available funds sufficient to cover the dollar amount of such check or ACH.

n.  <u>Borrower Information; Change Notification</u>. That Borrower's legal name and address as they appear in Section 15 are accurate and complete, and Borrower shall immediately notify Lender in writing of any change in Borrower's Place of Business, bank account information, legal name, physical address, contact information for Borrower or any principal of Borrower (including any change in telephone number), mailing address, business type, state of organization, ownership, management, or control and shall execute any and all documents requested by Lender at any time to bring Borrower into compliance with this Note and any other Loan Document.

Initials_____

o. **Competency; Authority**. That Borrower and all Guarantors are legally competent and have all necessary power and authority to enter into and perform their respective obligations under this Note and the other Loan Documents.

p. **Confidentiality**. That Borrower shall not disclose to any third party, without the written consent of Lender, any terms and conditions applicable to Borrower's Credit Line, whether such terms and conditions are set forth on the applicable Fees and Rates Schedule, Advance Schedule, this Note or any other Loan Document. Borrower's confidentiality obligations under this Note shall survive termination of this Note or any other Loan Document.

q. **Westlake Portal**. That Borrower may have an account with Lender where information can be accessed and transmissions can be sent through the Westlake Portal or by other electronic means, and Borrower shall have the means and the affirmative obligation to control access to the account information of Borrower by passwords and a Borrower account number. Borrower shall be solely responsible for any unauthorized access to Borrower's account. Access to Borrower's account may be revoked or otherwise restricted by Lender at any time, in Lender's sole discretion, without prior notice to Borrower.

r. **Use of Advances; No Personal Use or Demos**. That Borrower shall use Advances solely for Business purposes and not for personal, family, or household purposes, and not for purposes of vehicle demonstration. This Note and all Advances requested or made hereunder shall be requested and made only for commercial purposes and Borrower hereby expressly and unconditionally waives, to the fullest extent permitted by Law, the protections of any Law intended to protect consumers or regulate consumer loans.

s. **Authorized Parties.** Borrower will provide Lender the name of each individual authorized to buy Inventory and make Advance requests hereunder on Borrower's behalf. Notwithstanding the foregoing or anything to the contrary in any Loan Document, Borrower shall be responsible and liable for all Advance requests and other Liabilities incurred by any such appointed individual or any other actual or apparent representative or agent of Borrower (regardless of whether such Person is specifically appointed by Borrower as contemplated above).

4. **CREDIT TERMS AND CONDITIONS**. Borrower understands and agrees to the following terms, conditions, covenants, and other agreements relating to its Credit Line and any Advance made under this Note and the other Loan Documents, and acknowledges that any failure by Borrower to adhere to any such terms, conditions, covenants, or other agreements shall result in Lender having the right (in addition to any other right that Lender may have), in its sole discretion and without notice to Borrower, to deem the occurrence a Maturity Event with respect to all related Advance:

a. **Advances**. The decision to make an Advance to or on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred, and Borrower understands that Lender may refuse to make an Advance at any time, with or without cause and without prior notice to Borrower or any Guarantors of such decision, despite any representations to the contrary by Lender. Borrower is not obligated to finance any Inventory through Lender.

b. **Reserve**. Borrower's Credit Line may require a Reserve as a credit underwriting condition to the grant of credit and as additional security for the repayment of Liabilities under this Note and the other Loan Documents. In the event a Reserve is either requested by Borrower or its

Initials_____

required by Lender, Borrower will be required to execute a Reserve Agreement, and the applicable Required Reserve Amount and Reserve Charge will be indicated therein.

c.   Title; MSO. Borrower must deliver or cause to be delivered to Lender the Title or MSO for any Unit of Lender Financed Inventory at the time of any related Floorplan Advance request for an Auction Purchase, or, in the event of a Third Party Purchase, within seven (7) days after Lender funds the related Floorplan Advance.

d.   Compliance. Borrower must be in complete compliance with this Note and the other Loan Documents before an Advance request may be approved by Lender. Additionally, Lender may require certain other information from Borrower to be submitted before Lender will consider an Advance request.

e.   Payment When Due. Borrower shall pay all Liabilities, without notice on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Liabilities. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to the Liabilities, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the remaining Collateral, on their respective Maturity Dates.

f.   Application of Payments. Payments received by Lender from Borrower or from another source with respect to the Liabilities under this Note shall be applied by Lender in any manner or order, for a single Advance or across multiple Advances, in Lender's sole discretion, unless said payment is directly related to a given Advance. Notwithstanding anything herein to the contrary, in the event of an Event of Default, Lender may apply all subsequent payments, including payments directly related to an Advance, in any manner or order in Lender's sole discretion. Payments initiated or received by Lender after 5:00 PM PST may be applied the next Business Day.

g.   Curtailment. A Curtailment for each Floorplan Advance may be granted to Borrower at the sole discretion of Lender at the end of the current Period under the applicable Advance Schedule. Upon obtaining a Curtailment for a given Floorplan Advance, Borrower shall pay the accrued Interest, associated Floorplan Fee, any other outstanding costs, interest, fees, and expenses related to the Floorplan Advance, and a principal reduction of such Floorplan Advance, in each case pursuant to the applicable Advance Schedule and the Fees and Rates Schedule.

h.   Offset. Lender may hold any property (and proceeds thereof) or funds belonging to or payable to Borrower or any of its Affiliates ("Offset Funds") and apply such Offset Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender, and Borrower hereby grants to Lender or its Affiliates, as the case may be, a lien on such Offset Funds. Lender and its Affiliates may at any time apply any or all of the Offset Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender. Borrower expressly waives any requirement of maturity or mutuality among Lender and its various Affiliates.

i.   Communications. Borrower hereby expressly authorizes Lender and its Affiliates to communicate with Borrower via facsimile transmissions, email, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any

Initials___

other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Borrower agrees that such express permission shall extend to any and all of the contact information that Borrower has provided herein, including physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Borrower may provide to Lender or that Lender may obtain from any third party at a later date. Borrower further authorizes the use of any information and data by Lender or any Affiliate of Lender that may have been used and/or submitted in reference to its contractual relationship with any of Lender's affiliates and/or related companies.

j.    <u>Proceeds of Sale; Replacements</u>. So long as Borrower is not in default of this Note or any other Loan Document, Borrower may sell Lender Financed Inventory to bona fide buyers in the Ordinary Course of Business, but nothing herein shall be deemed to waive or release any interest Lender may have hereunder or under any other agreement in any proceeds or replacements of such Lender Financed Inventory.

k.    <u>Assignment of Amounts Due or to Become Due</u>. Borrower assigns to Lender all Borrower's accounts, deposit accounts, accounts receivable, holdback reserves, manufacturer rebates and incentive payments, payment intangibles, instruments, commercial tort claims, letter of credit rights, investment property, securities and securities accounts, general intangibles, chattel paper, documents, instruments, documents of title, and any similar types of tangible or intangible property included in the Collateral; and to the extent not covered by the foregoing, all proceeds of the foregoing. With or without the occurrence of a Maturity Event under this Note and the other Loan Documents, Borrower hereby authorizes and empowers Lender to:

     (i)   notify each person obligated to make payment on such assigned property to make payment directly to the Lender;

     (ii)   demand, collect and receive payment from each person obligated to make payment on such assigned property and give such persons binding receipts for, all sums due and/or to become due and, in Borrower's name or otherwise, to prosecute suits therefor;

Borrower unconditionally and irrevocably authorizes and instructs each person obligated to make payment on such assigned property to make payment directly to Lender as instructed by Lender, and authorizes such persons to rely on a copy of this Note and the other Loan Documents as evidence of the Borrower's authorization and instruction. This assignment is irrevocable without the prior written consent of Lender and is provided as additional security for and not as payment of obligations owed by Borrower under this Note and the other Loan Documents. Lender shall apply any sums received from persons obligated to make payment on such assigned property to the outstanding Liabilities under the Note and other Loan Documents.

l.    <u>Audit</u>.

     (i)   <u>Books</u>. Borrower shall allow Lender and its Representatives to access Borrower's books and records at Borrower's Place of Business and any other place that Borrower conducts business, during normal business hours and at other reasonable times, without prior notice to Borrower of such audits, in

Initials_____ DS / Mk

order to inspect and make copies of Borrower's books and records. Borrower shall be responsible for and agrees to pay all of Lender's expenses in conducting such audits.

(ii) <u>Lender Financed Inventory</u>. Borrower shall allow Lender and its Representatives to have access to, and to audit, Borrower's Lender Financed Inventory. Each Unit of Lender Financed Inventory must be physically verified, including via photographs that are uniquely coded (and documented as such) at the time of any audit conducted by or on behalf of Lender to be at Borrower's Place of Business, or such other place as Lender may authorize in writing. In the event that any Unit of Lender Financed Inventory is not so verified, Lender may, in its sole discretion, provide Borrower an opportunity to produce such Unit of Lender Financed Inventory at Borrower's Place of Business, or such other place as Lender may authorize.

m. <u>Trusted Title</u>. Borrower may request from Lender, for a legitimate business purpose, Title to a Unit of Lender Financed Inventory, which Lender reserves the right to grant or deny such request in its sole discretion. In the event Lender grants any such request, any Title provided to Borrower or to any other Person on Borrower's behalf shall be governed by the conditions outlined in Lender's trusted title form that Borrower must sign and consent to as a condition of Lender granting possession of Title to Borrower. Borrower shall, upon demand, immediately return any Title provided by Lender under this section.

n. <u>Credit Review; Disclosure</u>. Borrower and each Guarantor authorize Lender to obtain and share credit information relating to Borrower and its Guarantors from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary. The individual signing below on behalf of Borrower expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the Effective Date. Borrower also authorizes Lender to contact any third parties to disclose information, including information contained in Lender application, for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, if a Credit Line is granted, Borrower and each Guarantor authorize Lender to review Borrower's account periodically, which may include obtaining additional credit information on Borrower and each Guarantor through any available medium.

o. <u>Non-Sufficient Funds</u>. Borrower's account is subject to "NSF" fees in the amount stated in the Fees and Rates Schedule or the maximum amount permitted by Law for each check or ACH issued by Borrower which is subsequently returned for insufficient funds, in addition to any charge or fee imposed by Borrower's and/or Lender's depository institution.

p. <u>Electronic Debiting</u>. Lender may process checks electronically, at first presentment and any re-presentments, by transmitting the amount of the check, routing number, account number, and check serial number to Borrower's financial institution. By submitting a check for payment, Borrower authorizes Lender to initiate an electronic debit from Borrower's bank account. When Lender processes Borrower's check electronically, Borrower's payment may be debited from Borrower's bank account as soon as the same day Lender receives Borrower's check.



Initials____

q. <u>Late Fees</u>. Borrower's account is subject to a late fee in the amount stated in the Fees and Rates Schedule, not to exceed the maximum amount permitted by Law, for any Unit of Lender Financed Inventory for which Borrower fails to remit payment under this Note or any other Loan Document when due. Borrower acknowledges and agrees that the late fee charged by Lender is a reasonable estimate of Lender's additional administrative burden and costs incurred due to the delay and inconvenience to Lender associated with a late payment.

r. <u>Administrative Fees</u>. Borrower's account is subject to Administrative Fees, as stated in the Fees and Rates Schedule. Borrower acknowledges and agrees that any such Administrative Fees charged by Lender is permitted under this Note and the other Loan Documents, and Borrower consents to the assessment of any such Administrative Fees to Borrower's account.

s. <u>Fees</u>. This Note and any other Loan Documents are subject to all applicable fees published in the Fees and Rates Schedule, as detailed on the Westlake Portal or otherwise communicated to Borrower in writing. Each Advance under this Note and any other Loan Documents shall be subject to the Fees and Rate Schedule effective at the time of such Advance.

t. <u>Subject to Change</u>. Lender may, from time to time, at Lender's sole discretion, upon the publication in the Westlake Portal, or otherwise communicated to Borrower in writing, amend the Fees and Rates Schedule. To the extent a conflict exists between this Note or any other Loan Document, on the one hand, and the Fees and Rates Schedule, on the other hand, the fees and rates of on the Fees and Rates Schedule, as the case may be, shall prevail.

u. <u>Acceleration</u>. Borrower waives demand, presentment for payment, notice of dishonor, protest, and notice of protest, and expressly agrees that this Note and all payments coming due under it and any other Loan Documents may be extended or modified from time to time without in any way affecting Borrower's liability under this Note or any other Loan Document. Borrower and Guarantors understand that Lender may, at any time and without notice to Borrower, with or without cause, demand that this Note immediately be paid in full. The demand nature of this Note does not limit Lender's election of remedies upon an Event of Default by Borrower, and Borrower and Guarantors acknowledge that upon Lender's declaration of an occurrence of an Event of Default, all Liabilities under this Note and the other Loan Documents shall automatically accelerate and Lender may, at any time and without notice to Borrower, demand immediate payment of all Liabilities under this Note and the other Loan Documents and take such further action as may be contemplated under Section 7 or otherwise permitted by Law or in equity. Borrower shall have the right to pay all Liabilities in full at any time.

v. <u>Maturity Event</u>. Notwithstanding Section 4(f), upon any disposition of a Unit of Lender Financed Inventory, whether by sale or otherwise, or the receipt by Borrower (or any other Person on behalf of Borrower) of full or partial payment by or on behalf of the purchaser of such Unit of Lender Financed Inventory, Lender may, without notice to Borrower and in Lender's sole discretion, deem the occurrence of a Maturity Event with respect to the related Floorplan Advance.

w. <u>Unit Proceeds</u>. The receipt, by Lender or Borrower, or any third party on Borrower's behalf, of proceeds related to any Unit of Lender Financed Inventory shall constitute conclusive proof of the sale or other disposition of such Unit of Lender Financed Inventory.

x. <u>GPS; Unit Location</u>. Lender may, in its sole discretion, require Borrower, a Borrower's cost, to immediately acquire, install and maintain GPS tracking units for the purpose of securing

Initials_____

Lender's security interest in the Lender Financed Inventory. At all times, Lender is to have access to data and reports pertaining to the location of the Lender Financed Inventory. Borrower acknowledges and agrees that the use of GPS tracking units under this Note and the other Loan Documents is solely for the above-stated purpose and will immediately remove and deactivate GPS tracking units from Lender Financed Inventory upon retail sale to retail consumers.

5.  EVENTS OF DEFAULT. The occurrence of any of the following events, without the need for notice, shall be considered an event of default under this Note and the other Loan Documents (each, an "Event of Default"):

    a.  Borrower or any Guarantor fails to perform any of its obligations, undertakings or covenants under this Note or under any other Loan Document, including any obligation to repay any Liability when due and Borrower's obligation to pay upon demand any outstanding Liability under this Note.

    b.  Borrower or any Guarantor breaches or otherwise violates any provision of this Note or any other Loan Document.

    c.  Borrower makes any representation or warranty to Lender, under this Note and other Loan Document or otherwise, or provides to Lender any schedule, certificate, financial statement, report, notice, or other writing, which is false or misleading in any material respect when made or delivered.

    d.  Any damage or destruction of any Lender Financed Inventory and appropriate insurance, including naming Lender as "Loss Payee" is not in effect as required under this Note or any other Loan Document.

    e.  Borrower or any Guarantor, any of their respective Parent Companies, or Affiliates, has defaulted in the payment or performance of any debt or obligation under any other agreement, whether to Lender or to a third party.

    f.  Borrower or any Guarantor, any of their respective Parent Companies, or Affiliates, becomes insolvent or consents to the appointment of a trustee, receiver, or other custodian for such Borrower, Guarantor, or Parent Company, as the case may be, or for any property belonging to any of the foregoing Persons; or such Borrower, Guarantor, or Parent Company, as the case may be, makes a general assignment for the benefit of its creditors; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency Law, or a dissolution or liquidation proceeding, is commenced by or against such Borrower, Guarantor, or Parent Company, as the case may be.

    g.  Any material changes in the management, ownership, or control of Borrower or its Parent Company occurs (unless such material change has been consented to in writing by Lender).

    h.  The voluntary or administrative dissolution, death, or incompetence of Borrower or any Guarantor, or any of their respective Parent Companies.

    i.  Any change in the financial condition of Borrower or any Guarantor, or any of their respective

Initials _____ MK

Parent Companies, that Lender in good faith deems adverse.

    j.   Borrower or any Guarantor, or any of their respective Parent Companies, admits in writing that it is unable to pay its debts as they become due.

    k.   The termination of any Individual and Personal Guaranty.

    l.   Lender in its sole and absolute discretion deems itself insecure for any reason.

6.   RIGHTS AND REMEDIES. Upon any Event of Default, Lender may, at its option and without notice to Borrower, exercise any or all of the following rights in a separate, successive, or concurrent fashion, and Lender's exercise of any rights hereunder shall not preclude Lender from pursuing other rights and remedies in conjunction therewith or at a later time:

    a.   <u>Acceleration</u>. Demand immediate payment of all Liabilities under this Note and the other Loan Documents and all other indebtedness and amounts owed to Lender and its Affiliates by Borrower and its Affiliates. Lender shall have all rights and remedies available hereunder and under the other Loan Documents, and all rights and remedies available to Lender at law or in equity, including the rights and remedies of a secured party under the UCC. These rights and remedies include the right to cancel any unfunded Advances; to enter into Borrower's premises with or without legal process, but without force, and to take possession of and remove any Collateral; and to notify any account debtors or other Person obligated on Collateral to make payment or otherwise render performance to or for the benefit of Lender. Lender shall have the right to contact any third parties, including auctions, governmental agencies, Borrower's licensing authorities, consumer finance companies, floorplan companies, other finance companies, consumers, other borrowers, Auction Insurance Agency, and such other Persons as Lender may elect to contact in its sole discretion, and to share such information as is necessary, in Lender's sole discretion, for any reason, including for purposes of and related to collection of any Liabilities under this Note and the other Loan Documents. At Lender's request, and to the extent Borrower may lawfully do so, Borrower shall assemble, prepare for removal, and make available to Lender at a place designated by Lender which is reasonably convenient for Lender and Borrower such Collateral as Lender may request.

    b.   <u>Receiver</u>. Initiate proceedings to appoint a receiver in any court of competent jurisdiction. To the extent permitted by Law, Borrower waives the right to notice and hearing of the appointment of a receiver and consents to such appointment without requiring Lender to post a bond.

    c.   <u>Bond</u>. To the extent permitted by Law, Borrower gives consent to Lender to proceed in any action to collect on or execute against any and all bonds that Borrower or its Affiliates may have posted with any governmental authorities or third parties.

    d.   <u>Foreclosure</u>. Without limiting the foregoing, Lender may take control of any funds generated by any Collateral, and in Lender's name or Borrower's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept surrender of, foreclose, or realize upon any Collateral. Borrower waives any and all rights it may have to notice prior to seizure by Lender of any Collateral. Borrower agrees that private sale of any Lender Financed Inventory at the amount then owed to Lender on such Lender Financed Inventory, less costs reasonably incurred by Lender in preparation of disposition of such Lender Financed Inventory, shall be as

Initials_____

a commercially reasonable method of disposition of such Collateral and to execute any necessary documents attesting as such subsequent to disposition. Additionally, Borrower further agrees that any Inventory Collateral repossessed or otherwise obtained by Lender after an Event of Default may be disposed of by Lender, in Lender's sole discretion, at any regular or online sale of any wholesale auto auction that may be an Affiliate of Lender, or at any National Auto Auction Association member, and, in each case, any such a sale is and shall be deemed commercially reasonable for all purposes and to execute any necessary documents attesting as such subsequent to disposition. Borrower shall be liable to Lender for any deficiency resulting from Lender's disposition of the Collateral. Borrower agrees that the Collateral is of the type customarily sold on a recognized market and that Lender therefore has no obligation to notify Borrower prior to a sale of any Collateral. Lender shall not be responsible for the accuracy or validity of any document or for the existence or value of any Collateral. Lender shall not be required to marshal any assets in favor of Borrower. Lender has no obligation to pursue any third party for any liability or obligation owed to Borrower. Borrower further agrees to pay all reasonable attorneys' fees and other collection costs incurred by Lender and its Affiliates in enforcing this Note and any other Loan Document after any Event of Default, regardless whether Lender and its Affiliates act upon, execute, receive judgment, order or enforce any of the foregoing in any manner, including, but not limited to, writs, replevins or otherwise. To the extent not prohibited by Law, Borrower waives all appraisement, valuation, anti-deficiency, homestead, exemption, and usury Laws now or hereafter in effect, and releases all right to appeal after payment in full.

7. LOAN DOCUMENTS. In addition to the execution and delivery of this Note and the exhibits attached hereto, as applicable, including, but not limited to the following documents: (a) a Power of Attorney in favor of Lender; (b) an Advance Schedule for each unique set of terms for the Finance Program applicable to Borrower, which may be amended from time to time; (c) such Guaranties of all of Borrower's Liabilities tender this Note and the other Loan Documents as Lender may request, including Guaranties of all owners of Borrower; (d) a Reserve Agreement in favor of Lender; and (e) prior to Lender authorizing Borrower to place any Lender Financed Inventory on consignment with another licensed dealer, a Consignment Agreement acceptable to Lender (collectively, with all other documents and instruments requested, published or otherwise communicated to Borrower in writing in connection with this Credit Line, the "Loan Documents").

8. ASSIGNMENT. This Note and any other Loan Document may be assigned by Lender without notice to Borrower, but any assignment by Borrower of this Note or any other Loan Document without the prior written consent of Lender shall be null and void.

9. THIRD PARTY BENEFICIARIES. Neither this Note nor any other Loan Document is intended to confer upon any Person other than the Parties any rights or remedies hereunder; provided, however, that the rights and remedies afforded to Lender under Sections 2, 5(h), 5(j), 5(o), 7, 11 and 14 shall also inure to the benefit of the Affiliates of Lender and such Affiliates shall be intended third party beneficiaries of the provisions thereof.

10. INDEMNIFICATION. Borrower shall, at its expense, defend, indemnify and hold harmless Lender and its Affiliates, and each of their respective directors, officers, principals, partners, shareholders or holders of any ownership interest, as the case may be, employees, Representatives, attorneys, and agents (the "Lender Parties") from and against any and all claims, judgments, losses, damages, demands, payments, fines, costs, expenses (including reasonable attorneys' fees and court courts), and liabilities of any nature or description incurred by a Lender Party to the extent arising from or relating to any of the following: (a) any personal injury or properly damage caused

Initials_____

by Borrower or any of its Representatives; (b) any breach by Borrower of this Note or any other Loan Document, including the breach of any representation, warranty, or other agreement contained in this Note or in any other Loan Document; and (c) Borrower's operation of its Business or any of Borrower's operations or activities.

11. NO JOINT VENTURE, PARTNERSHIP, OR AGENCY. Nothing contained in this Note or in any other Loan Document shall confer upon Lender or Borrower any interest in, or subject either of them to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of the other. This Note does not constitute and shall not be characterized as a joint venture, partnership, or agency between Lender and Borrower. Nothing in this Section 12 shall limit or restrict the respective obligations and undertakings of Lender and Borrower hereunder.

12. AMENDMENT; MERGER; AUTHORITY. This Note and the other Loan Documents are intended by the Parties to be an amendment to and restatement of any prior Promissory Note and Loan and Security Agreement or similar document or instrument (including any prior promissory note, loan and security agreement or similar contract) between Lender and Borrower. With the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, this Note may be modified or amended only upon the written consent of Lender and Borrower. In the case of the other Loan Documents, with the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, such other Loan Documents may be modified or amended only upon the written consent of Lender and the Person to whom such amendment relates. Additionally, the Finance Programs, descriptions of specific Units of Lender Financed Inventory, amounts and terms of Advances, Maturity Dates, Extensions, Interest, Base Rates, Administrative Fees, late fees, NSF fees, and other charges allowed by this Note or any other Loan Document may be proven by the records kept by Lender. Notwithstanding the foregoing, any advance and/or loan originated pursuant to one or more agreements between Borrower and Lender prior to the Effective Date for which indebtedness from Borrower remains outstanding as of the Effective Date, shall remain subject to the terms and conditions of such prior agreement(s) for all intents and purposes until such indebtedness has been indefeasibly repaid and satisfied in full.

Any amendment or modification to this Note or any other Loan Document shall be valid if and only if signed by a manager, director, or officer of Lender with actual authority to do so that is designated on the Westlake Portal or otherwise communicated to Borrower in writing by a director or officer of Lender. Borrower further acknowledges and agrees that Borrower expressly waives any right to assert or rely upon apparent authority with respect to amendment or modification of this Note or any other Loan Document.

13. EXECUTION. The Parties understand and agree that Lender may execute this Note and any other Loan Documents by affixing the signature of an authorized representative of Lender via signature stamp. Additionally, Lender may execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature, which electronic or digital signature shall for all purposes be deemed effective to constitute the valid signature of Lender. Any electronic or digital signature affixed to this Note or any other Loan Documents by Lender shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. Notwithstanding the

Initials_____

foregoing, Borrower may execute this Note and any other Loan Documents only by original signature of an authorized officer of Borrower, unless otherwise authorized by Lender in writing. Lender may, in its sole discretion, permit Borrower and/or any Guarantor to execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature. Borrower acknowledges and agrees that any electronic or digital signature of Borrower or any Guarantor shall for all purposes be deemed effective and constitute the valid signature of Borrower or Guarantor, as the case may be, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the E-Sign Act, and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of signatures on this Note and any other Loan Documents shall be deemed original signatures for all intents and purposes. This Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute one and the same agreement.

14. NOTICES. All notices, demands and requests required or permitted to be given under this Note and any other Loan Document shall be (a) in writing, (b) sent by e-mail with a confirmation of the delivery thereof, delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given on the date sent by e-mail with a confirmation of the delivery thereof, the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (d) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Borrower (through written notice, via the Westlake Portal, or otherwise) for purposes of directing future notices, demands or requests):

> If to Lender:   Westlake Flooring Company, LLC
> 4751 Wilshire Blvd., Suite 100
> Los Angeles, CA 90010
> dealers@wfs-flooring.com
>
> With a copy to: Legal Department
> Westlake_LegalDepartment@westlakefinancial.com

> If to Borrower:   MK AUTOMOTIVE, INC.
> 8000 Park Blvd N
> Pinellas Park, FL 33781
> Attn:   Michael Kastrenakes

15. NO WAIVER. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any Term or Condition will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

16. TERMINATION. No termination of this Note shall alter Borrower's obligations and Liabilities relating to Advances and amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including the security interest granted herein and the rights of Lender as a secured party hereunder, shall extend until all Liabilities owed by Borrower to Lender have been indefeasibly paid and satisfied in full.

Initials_____

17. LEGAL FEES AND COLLECTION COSTS. Borrower shall pay to Lender all reasonable legal fees, expenses, and collection costs, including, but not limited to, repossession and spotters, incurred by Lender, Lender's Affiliates, and/or Lender's Representatives as a result of any Event of Default, Borrower's failure to perform any obligation or satisfy any Liability under this Note or any other Loan Document, and/or Borrower's unsuccessful prosecution of affirmative claims or counterclaims against such party or parties.

18. SEVERABILITY. Any provision of this Note or any other Loan Document that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note and the other Loan Documents or affecting the validity or enforceability of any provision of this Note or any other Loan Document in any other jurisdiction.

19. GOVERNING LAW. The validity, enforceability, and interpretation of this Note and the other Loan Documents shall be governed by the internal Laws of the State of California, without regard to conflicts of Laws provisions thereof.

20. JURISDICTION AND VENUE. As evidenced by Borrower's signature below, Borrower submits to the personal jurisdiction and venue of the state courts of Los Angeles County, California, and agrees that any and all claims or disputes pertaining to this Note or any other Loan Document, or to any matter arising out of or related to this Note or any other Loan Document, initiated by Borrower against Lender, shall be brought in the state courts of Los Angeles County, California. Further, Borrower expressly consents to the jurisdiction and venue of the state courts of Los Angeles County, California, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue, or forum non-convenient with respect to any such action. Borrower acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Borrower in any court of competent jurisdiction, and Borrower consents to such forum as Lender may elect. Further, Borrower acknowledges and agrees that any preliminary or injunctive relief, claims or actions initiated by Lender due to Collateral location, including but not limited to, repossession, replevin, sequestration, or foreclosure, shall not preclude Lender from initiating any other claims or proceedings in any other venue, and Borrower expressly agrees that any and all claims or defenses that it may have shall be exclusively subject to that venue. To the extent that Borrower initiates any claims or defenses contrary to the foregoing, Borrower expressly agrees to take all actions necessary to transfer venue in accordance with this section and to reimburse Lender for all costs, fees and reasonable attorneys' fees in enforcing this section.

21. WAIVER OF CLASS ACTION RIGHTS. CLASS ACTIONS OF ANY KIND ARE NOT PERMITTED. BORROWER AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. BORROWER AGREES THAT, BY ENTERING INTO THIS NOTE, BORROWER IS WAIVING ITS RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE COURT MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. BORROWER ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND

Initials_____

DATES OF SPECIFIC ADVANCES, ARE UNIQUE TO AND NEGOTIATED BY BORROWER, AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS.

22. WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR BORROWER TO THE MAXIMUM EXTENT PERMISSIBLE BY LAW. NEITHER LENDER NOR BORROWER SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR BORROWER EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND BORROWER.

23. LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR ANY ADVANCES MADE BY LENDER HEREUNDER OR THEREUNDER), EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND REGARDLESS OF THE CAUSE OF ACTION UNDER WHICH SUCH DAMAGES ARE SOUGHT (TORT OR CONTRACT). FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR IN CONNECTION WITH ANY ADVANCE BY LENDER HEREUNDER OR THEREUNDER) THAT EXCEEDS, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THIS NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

24. WAIVER OF BOND. BORROWER WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY BOND OR SURETY OR SECURITY ON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF LENDER DURING ATTEMPTS TO RECOVER COLLATERAL OR OTHERWISE.

25. CALIFORNIA BORROWERS. In the event Borrower's Place of Business is in the State of California, Borrower acknowledges and agrees that any initial Advance made under this Note must be in the amount of at least Five Thousand Dollars and Zero Cents ($5,000), and Borrower shall neither request nor accept any initial Advance under this Note in an amount less than Five Thousand Dollars and Zero Cents ($5,000).

26. DISCLAIMER. THE WESTLAKE PORTAL LICENSED OR PROVIDED HEREUNDER IS

Initials_____

PROVIDED AS A CONVENIENCE TO BORROWER AND ON AN "AS-IS" BASIS. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, TITLE, ACCURACY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LENDER MAKES NO REPRESENTATIONS OR WARRANTIES THAT THE WESTLAKE PORTAL WILL OPERATE ERROR-FREE OR ON AN UNINTERRUPTED BASIS, AND LENDER SHALL IN NO EVENT BE LIABLE OR RESPONSIBLE FOR ANY OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY WITH RESPECT TO THE WESTLAKE PORTAL, AND NO SUCH OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY SHALL EXCUSE ANY FAILURE BY BORROWER TO TIMELY PERFORM ALL OF ITS OBLIGATIONS TO LENDER UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS.

27. DESCRIPTIVE HEADINGS; INTERPRETATION. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Note. As used in this Note and the other Loan Documents, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import. Words (including the defined terms set forth in Appendix A) of one gender shall be held to include the other gender as the context requires. Any references in this Note or in the other Loan Documents to a particular statute or regulation shall be deemed to include all amendments thereto, rules and regulations thereunder and any successor statute, rule, or regulation, or published clarifications or interpretations with respect thereto, in each case as in effect from time to time.

28. EFFECTIVE DATE OF OTHER LOAN DOCUMENTS. Unless otherwise stated in the applicable Loan Document, the effective date of any Loan Document executed by a party shall be the later of (a) the Effective Date of this Note, or (b) the date of Borrower's execution thereof as set forth below Borrower's signature thereon (or, in the case of any Guaranty, the date of Guarantor's execution thereof as set forth below Guarantor's signature thereon). In the event that the date of Borrower's or Guarantor's execution of any Loan Document is not set forth below Borrower's or Guarantor's signature thereon, then the effective date of such Loan Document shall be deemed to be the Effective Date of this Note.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Promissory Note and Loan and Security Agreement on the dates set forth below.

WESTLAKE FLOORING COMPANY, LLC

By: _____
Name: Jonathan Zhan
Title: Senior Vice President
Date: 11/28/2018 | 1:55:53 PM PST

MK AUTOMOTIVE, INC.

By: _____
Name: Michael Kastrenakes
Title: President
Date: 11/28/2018 | 1:51:18 PM PST


Initials_____

## APPENDIX A
## DEFINITIONS

1. "Administrative Fee" shall mean any expense charged by Lender to Borrower that is reasonable or necessary, in Lender's sole discretion, to administer or monitor Borrower's account, to preserve or secure any Collateral, or to collect any Liabilities under this Note.

2. "Advance" shall mean any discretionary loan or payment in any amount, for any purpose, made pursuant to this Note by Lender to Borrower or on Borrower's behalf to any third party. "Advance" includes Floorplan Advance.

3. "Advance Schedule" shall mean any addendum or other document executed or published to the Westlake Portal or otherwise communicated to Borrower in writing pursuant to this Note and the other Loan Documents, as modified from time to time in Lender's sole discretion, which indicates the applicable specific terms regarding the principal reduction requirement to obtain a Curtailment of the applicable Maturity Date, number of available Curtailments, the Floorplan Fee, and any other terms as used therein.

4. "ACH" shall mean any payment by or on behalf of Borrower to Lender made via a nationwide electronic funds transfer network processing electronic debit and credit entries to or from Borrower's bank accounts.

5. "Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first-named Person (which shall, for purposes of clarity, include any parent company and any direct or indirect subsidiary of such first-named Person) and, if such first-named Person is a natural person, also includes any member of such first-named Person's immediate family. For purposes of this definition, the term "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

6. "Auction Purchase" shall mean any purchase made by or on behalf of Borrower for which a request for an Advance is made by or on behalf of Borrower from an auction.

7. "Base Rate" shall mean the greater of (a) the "Prime Rate" published in The Wall Street Journal on the date(s) noted below (in the event no such rate is published in The Wall Street Journal on such date(s), the Base Rate shall be the "Prime Rate" published therein for the most recent business day preceding the last business day of such month on which such rate was published) or, in the event The Wall Street Journal does not quote a "Prime Rate," the rate quoted as the "Prime Rate" in a publication as Lender may, from time to time, hereafter designate in writing), and (b) that fixed rate of interest as stated in the Fees and Rates Schedule. The Base Rate, unless otherwise amended pursuant to this Note and the other Loan Documents, shall be determined by Lender on the last Business Day of each calendar month and shall be in effect for the following calendar month.

8. "Borrower" shall have the meaning set forth in the Preamble.

9. "Borrower's Place of Business" shall mean the location where the Collateral and Borrower's books and records are kept, and where Borrower's operations are conducted, as further defined in **Exhibit G**.

Initials_____

10. "Business" shall mean Borrower's business, as it relates to the purchase and sale of Inventory and/or the origination of any Receivables.

11. "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or day on which banking institutions in Los Angeles, California are authorized or obligated by Law or executive order to be closed.

12. "Check" shall mean any payment by or on behalf of Borrower to Lender not made in cash, via certified funds, wire transfer, or ACH.

13. "Collateral" shall have the meaning set forth in Section 2(a).

14. "Contract Rate" shall mean that rate of interest as stated on the applicable Fees and Rates Schedule.

15. "Credit Line" shall mean Borrower's floorplan line of credit with Lender pursuant to and under this Note.

16. "Curtailment" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date for an additional Period. The number of allowable Curtailments shall be as stated on the applicable Advance Schedule.

17. "Effective Date" shall have the meaning set forth in the Preamble.

18. "E-Sign Act" shall have the meaning set forth in Section 14.

19. "Event of Default" shall have the meaning set forth in Section 6.

20. "Extension" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date beyond the last Period as stated in the applicable Advance Schedule.

21. "Fees and Rates Schedule" shall mean that current schedule of fees and rates applicable to the Note and the other Loan Documents posted on the Westlake Portal, or otherwise communicated to Borrower in writing, which Lender may amend or modify in its sole discretion from time to time, and without notice other than posting any updates to the Fees and Rates Schedule on the Westlake Portal, or otherwise communicated to Borrower in writing, including, but not limited to, any defined fees or rates in this Note and the other Loan Documents, the Advance Schedule, the Insurance Requirements, fees for the Inventory Protection Program, any applicable marketing or promotional terms for each Finance Program applicable to Borrower's Credit Line.

22. "Finance Program" shall mean any finance program offered by Lender and available to Borrower for the financing of inventory pursuant to an Advance under this Note.

23. "Floorplan Advance" shall mean an Advance made pursuant to this Note relating to a Unit of Lender Financed Inventory to be offered for sale by Borrower in the Ordinary Course of Business.

24. "Floorplan Date" shall mean (a) for an Auction Purchase, the sale date regardless of the date the Floorplan Advance is actually requested or funded; and (b) for a Third Party Purchase, the dates

Initials_____

the request for the Floorplan Advance is received by Lender, regardless of the date such Floorplan Advance is actually funded.

25. "Floorplan Fee" shall mean the fee charged by Lender to Borrower, as set forth on the applicable Advance Schedule, for each Unit of Lender Financed Inventory for each Period, including any Extensions thereof.

26. "Guarantor" shall mean any Person executing this Note as a Guarantor or any Person executing any Guaranty pursuant to this Note.

27. "Insurance Requirements" shall mean the insurance requirements listed in Exhibit D, which is subject to change without notice at Lender's sole option.

28. "Interest" shall mean the aggregate rate of interest which accrues on all Liabilities owed by Borrower to Lender under or arising out of this Note or the other Loan Documents.

29. "Inventory" shall mean all Units held by Borrower for retail sale by Borrower. "Inventory" includes Lender Financed Inventory.

30. "Inventory Protection Program" shall mean that certain program in which Borrower may participate in lieu of providing third party insurance as required under this Note or the other Loan Documents.

31. "Law" or "Laws" shall mean applicable common law and any applicable statute, permit, ordinance, code or other law, rule, regulation or order enacted, adopted, promulgated or applied by any governmental authority. all as in effect from time to time.

32. "Lender" shall have the meaning set forth in the Preamble.

33. "Lender Financed Inventory" shall mean all Units for which an Advance has been made under this Note.

34. "Lender Parties" shall have the meaning set forth in Section 11.

35. "Liabilities" shall mean any and all Advances, debts, financial obligations, Administrative Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorneys' fees, costs of collection, covenants, and duties owing, arising, due, or payable from Borrower to Lender of any kind or nature, present, or future, under any instrument, guaranty, or other document, whether arising under this Note, any other Loan Document, or otherwise. whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing, or hereafter arising, and however acquired.

36. "Liens" shall mean any claims, liabilities. security interests, liens, mortgages, deeds of trust, pledges, conditions, charges, claims, options, rights of first refusal, easements. proxies, voting trusts or agreements, transfer restrictions under any contract or agreement or encumbrances of any kind or nature whatsoever.

37. "Loan Documents" shall have the meaning set forth in Section 8

38. "Maturity Date" shall mean for all Liabilities concerning or relating to an Advance, the earlier of

Initials_____

      i)  the last day of the current Period;
      ii)  the day on which an Event of Default occurs;
      iii)  the day on which a Maturity Event occurs;
      iv)  seven (7) days after the date of the Unit sale, as applicable, if financed;
      v)  within twenty-four (24) hours after the date Borrower receives payment by or on behalf of the purchaser of such Unit, as applicable; or
      vi)  the termination of this Note and the other Loan Documents.

39. "Maturity Event" shall mean any event, act or circumstance arising under this Note or any other Loan Document (including any failure by Borrower to adhere to any term or provision of this Note or any other Loan Document), which Lender deems, in its sole discretion and without notice to Borrower the event, act or circumstance a "Maturity Event" with respect to any Floorplan Advance.

40. "MSO" shall mean the manufacturer 's certificate of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

41. "Note" shall mean this Promissory Note and Loan and Security Agreement and all present and future amendments, modifications, and addendums referenced herein.

42. "Offset Funds" shall have the meaning set forth in Section 4(h).

43. "Ordinary Course of Business" shall mean the ordinary course of the Business of Borrower, consistent with past practices (but only to the extent such past practices were in compliance with Law and in accordance with best industry practices).

44. "Parent Company" shall mean, with respect to Borrower or any Guarantor, the Person(s) that, directly or indirectly, have the power to direct or cause the direction of the management and policies of Borrower or Guarantor, as the case may be, whether through the ownership of voting securities, by contract or otherwise.

45. "Party" or "Parties" shall have the meaning set forth in the Preamble.

46. "Period" shall mean the number of days set forth on the applicable Advance Schedule, which shall be calculated beginning on the Floorplan Date.

47. "Person" shall mean any individual, corporation, joint stock company, association, partnership, joint ventures, trust, estate, limited liability company, limited liability partnership, governmental authority or other entity or organization.

48. "Receivable" shall mean chattel paper, including a retail installment contract or buy here pay here contract, evidencing a monetary obligation of a buyer for the purchase of a motor vehicle from Borrower and the granting of n security interest in the vehicle to Borrower as security for the repayment of the monetary obligation.

49. "Representative" shall mean, with respect to Borrower or Lender, as the case may be, the directors, officers, stockholders, employees, trustees, agents, and representatives, including any investment banker, consultant, attorney, or accountant, or auditor, of Borrower or Lender, as the case may be.

Initials

50. "Required Reserve Amount" shall mean the aggregate total amount of funds required to be remitted by Borrower to Lender, as set forth in the applicable Reserve Agreement, and held in the Reserve as a condition to the grant of Credit under this Note and the other Loan Documents.

51. "Reserve" shall mean the cash deposited with Lender by Borrower on a voluntary basis or as required as an underwriting condition and held by Lender as additional security for Borrower's Liabilities under this Note and the other Loan Documents.

52. "Reserve Charge" shall mean that charge by Lender to Borrower, as set forth on the applicable Advance Schedule, assessed for the purpose of funding any Reserve.

53. "Third Party Purchase" shall mean all purchases or other requests for an Advance, made by or on behalf of Borrower, or third-party business that has entered into a Third Party Funding Agreement with Lender that does not constitute an Auction Purchase.

54. "Title" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, commonwealth, province, or government agency.

55. "UCC" shall mean the Uniform Commercial Code as enacted in the State where the Collateral at issue is located.

56. "Unit" shall mean any manufactured item, including motor vehicles, for which there exists a Title, MSO, or other similar evidence of ownership acceptable to Lender.

57. "Westlake Portal" shall mean any web-based portal, interface or website owned, operated or maintained by Lender and to which Borrower shall have access to from time to time as determined by Lender.



Initials_____

**EXHIBIT A**
**ADVANCE SCHEDULE**

Borrower:     MK AUTOMOTIVE, INC.
Account Number:   5464163

This Advance Schedule is being entered into by the undersigned borrower ("Borrower") and Westlake Flooring Company, LLC ("Lender") pursuant to that certain Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The Period(s) and the required principal reduction for each Curtailment on each Advance made pursuant to the Note and this Advance Schedule shall be as follows:

| Period | Number of Days in Period | Required Principal Reduction to Extend Maturity Date | Floorplan Fee |
|---|---|---|---|
| 1 | 60 | 5% | $ $80 |
| 2 | 30 | 5% | $ $55 |
| 3 | 30 | 100% | $ $55 |
| 4 |  |  | $ |
| 5 |  |  | $ |

Additional fees, charges, and other terms applicable to Advances made pursuant to the Note and this Advance Schedule are set forth on the Fees and Rates Schedule, which can be found on the Westlake Portal or will be otherwise communicated to Borrower in writing.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Advance Schedule on the dates set forth below.

WESTLAKE FLOORING COMPANY, LLC

By: _____
Name: Jonathan Zhan
Title: Senior Vice President
Date: : 11/28/2018 | 1:55:53 PM PST

MK AUTOMOTIVE, INC.

By: _____
Name:    Michael Kastrenakes
Title:    President
Date: 11/28/2018 | 1:51:18 PM PST

Initials_____

## EXHIBIT B
## POWER OF ATTORNEY

MK AUTOMOTIVE, INC.

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to Westlake Flooring Company, LLC ("Lender") pursuant to that certain Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

   a. execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

   b. execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

   c. make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

   d. endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items

Initials _MK_

DocuSign Envelope ID: B5DF1FA5-5FFD-4F5E-B8D2-820442722CC0

of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

e.   endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

f.   endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

g.   use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

h.   pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

i.   communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

j.   contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

k.   do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3.   Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

a.   demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

b.   file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or

Initials _____

consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

c. file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

d. notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

[Signature Page Follows]

Initials

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

MK AUTOMOTIVE, INC.

By: _____

Name:  Michael Kastrenakes
Title:   President
Date:   11/28/1 ?

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of ___Florida___ }

County of ___Pinellas___

On __11/28/2018__ before me, ( ___Hillary M. Sousa___ ), personally
<span>Name of Notary Public</span>

appeared ___Michael Kastrenakes___ , who proved to me on the
<span>Name of Signatory</span>

basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ___Florida___ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature

**HILLARY M SOUSA**
MY COMMISSION # FF951409
EXPIRES February 19, 2020
(407) 398 0153     FloridaNotaryService.com

Notary Public Seal

---

I, ___Summer Reese___ , attest that the signatures on this page, including my signature, are signed in my presence and in the presence of each other, at the date hereof.

_____
Subscribing Witness

---

Initials [MK]

DocuSign Envelope ID: B5DF1FA5-5FFD-4F5E-B8D2-820442722CC0

## EXHIBIT C
## INDIVIDUAL AND PERSONAL GUARANTY

THIS INDIVIDUAL AND PERSONAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of Westlake Flooring Company, LLC ("Lender"), pursuant to that certain Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1. DEFINITIONS. Capitalized terms used herein and not defined in this Section I or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

   a. "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

   MK AUTOMOTIVE, INC.
   8000 Park Blvd N
   Pinellas Park, FL 33781
   Telephone:    (727) 423-1913
   E-Mail:    mukek@newwaveautosales.com

   b. "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees, and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2. GUARANTY AND OTHER AGREEMENTS.

   a. Guaranty Obligations. Guarantor hereby voluntarily, unconditionally, and absolutely guarantees: (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities; and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, and in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) fifteen percent (15%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

   b. General Nature of Guaranty. Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute,

unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities; (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state or organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

c.  Continuing and Unlimited Nature of Guaranty. The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrower, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

d.  Waivers by Guarantor. Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permanent increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

e.  Authorization. Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary. Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this

Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

f.  Security Interest. For the purpose of securing this Guaranty, Guarantor hereby grants Lender a security interest in all of Guarantor's assets and personal properties, now owned and hereinafter acquired, wherever located, including all vehicles, inventory, parts and accessories inventory, equipment, goods, fixtures,  accounts, deposit accounts, accounts receivable, holdback reserves,  manufacturer rebates and incentive payments, payment intangibles, instruments, commercial tort claims, letter of credit rights, investment property, securities and securities accounts, and general intangibles of Guarantor; any cash, money, or other property of Guarantor; all accessions to, substitutions for, and all replacements of any of the foregoing; all chattel paper, documents, instruments, monies, documents of title, residues and property of any kind related to any of the foregoing; all books and records of Guarantor related to any of the foregoing, including without  limitation, computer programs, print-outs, and other computer hardware and software materials and records pertaining to any of the foregoing; together  with all proceeds and products of the foregoing, including, without limitation, proceeds of insurance policies insuring any of the foregoing (collectively, "Collateral"). The security interest granted in this Guaranty is in addition to and not in substitution of any right of offset, netting, or reclamation that Lender may have against Guarantor pursuant to any contract or applicable law.

By execution hereof, Guarantor authorizes Lender to file any financing or continuation statements under the UCC with respect to the security interest in the Collateral granted hereunder.

g.  Communication. Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions , both to a residential telephone line or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters,  account  information,  marketing  materials,  collection,  and/or  any  other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or that Lender may obtain from any third party at a later date.

h.  Enforcement. In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securities which Lender may now or hereafter hold.

i.  Reinstatement. Guarantor agrees that, if, at any time, all or any part of any payment theretofore

applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency , bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender , and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

j.  Financial Statements. Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, as applicable, and such other financial statements, information, and other materials as Lender may request from time to time.

k.  Application of Payments: Subrogation. Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3.  TERMINATION.

a.  Payment of Liabilities and Termination of Credit Line. Upon Lender's written consent, this Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

b.  Revocation of Guaranty. This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4.  EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "Event of Default"):

a.  Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

b.  Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

c.  Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

d.  Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of

the business, estate, or assets or of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "Bankruptcy Filing");

e.  Any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

f.  Any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates, which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

g.  there is any Event of Default by Guarantor under the Note and Guaranty.

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5.  GENERAL.

a.  <u>Assignment; Successors and Assigns</u>. This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender. The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns. Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

b.  <u>Amendment, Merger</u>. This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender). This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor. The Parties acknowledge that Guarantor may have also acknowledged and consented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented. In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

c.  <u>Execution</u>. Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature.

Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

d. <u>Notices</u>. All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) sent by e-mail with a confirmation of the delivery thereof, delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date sent by e-mail with confirmation of the delivery thereof, the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise) for purposes of directing future notices, demands or requests):

> If to Lender:   Westlake Flooring Company, LLC
> 4751 Wilshire Blvd., Ste 100
> Los Angeles, CA 90010
> dealers@wfs-flooring.com
>
> With a copy to: Legal Department
> Westlake_LegalDepartment@westlakefinancial.com
>
> If to Guarantor:   Michael Kastrenakes
> 1755 McCauley RD
> Clearwater, FL 33765

e. <u>No Waiver</u>. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any term or condition of this Guaranty will operate as such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

f. <u>Severability</u>. Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

g. <u>Governing Law</u>. The validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of California, without regard to conflicts of Laws provisions thereof.

h. <u>Jurisdiction and Venue</u>. As evidenced by Guarantor's signature below, Guarantor submits to

the personal jurisdiction and venue of the state courts of Los Angeles County, California, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, initiated by Guarantor against Lender, shall be brought in the state courts of Los Angeles County, California. Further, Guarantor expressly consents to the jurisdiction and venue of the state courts of Los Angeles County, California, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action. Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect, including, but not limited to, multiple forum in the event Lender initiates and prosecutes an action for the purposes of acquiring, foreclosing or disposing of Guarantor's personal or real property. Further, Guarantor expressly agrees that any and all claims or defenses that it may have shall be exclusively subject to the venue that Lender elects to utilize for purposes other than foreclosing or disposing of Guarantor's personal or real property. To the extent that Guarantor initiates any claims or defenses contrary to the foregoing, Guarantor expressly agrees to take all actions necessary to transfer venue in accordance with this section and to reimburse Lender for all costs, fees and reasonable attorneys' fees in enforcing this section.

i. WAIVER OF CLASS ACTION RIGHTS. ANY PROCEEDING UNDER THIS GUARANTY WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ACTIONS OF ANY KIND ARE NOT PERMITTED. GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE COURT MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

j. WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR TO THE MAXIMUM EXTENT PERMISSIBLE BY LAW. NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY

LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

k.  LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND REGARDLESS OF THE CAUSE OF ACTION UNDER WHICH SUCH DAMAGES ARE SOUGHT (TORT OR CONTRACT). FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

l.  Descriptive Headings; Interpretation. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty. As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

[Signature Page Follows]

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.

Michael Kastrenakes

By: _____

Date: ___11/28/18___

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of _Florida_

County of _Pinellas_

On __11/28/2018__ before me, ( ___Hillary M Sousa___ ), personally
<br>Name of Notary Public
appeared ___Michael Kastrenakes___ , who proved to me on the
<br>Name of Signatory

basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _Florida_ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature

HILLARY M SOUSA
MY COMMISSION # FF951409
EXPIRES February 19, 2020
FloridaNotaryService.com

Notary Public Seal

---

I, ___Summer Reese___ , attest that the signatures on this page, including my signature, are signed in my presence and in the presence of each other, at the date hereof.

_____
Subscribing Witness

---

Dealer No.: 5464163

Exhibit C: Individual and Personal Guaranty_03/2018

Initials _____

**<u>EXHIBIT D</u>**
**<u>INSURANCE REQUIREMENTS</u>**


[SEE ATTACHED]



Initials_____

DocuSign Envelope ID: B5DF1FA5-5FFD-4E5F-B9D3-62044BF23CC0

## EXHIBIT E
## CORPORATE / LLC AUTHORIZING RESOLUTION TO BORROW AND CERTIFICATION

[SEE ATTACHED]

Use **_One_** of Corporate or LLC Authorizing Resolution, as applicable



Initials_____

**EXHIBIT F**

| AUTOMATIC CLEARING HOUSE (ACH) AUTHORIZATION FORM |
|:---:|

| TERMS AND CONDITIONS |
|---|
| The undersigned Dealer hereby authorizes Westlake Flooring Services ("Westlake") to initiate Automated Clearing House ("ACH") for Dealer credit entries and to initiate, if necessary, debit or credit entries and adjustments for any debit or credit entries in error to Dealer's checking/savings account indicated below. Westlake may initiate an authorized withdrawal in the amount requested by Dealer in a written or oral communication with Westlake or in the amount due and owing by Dealer under the Agreement, including any interest and fees thereon. Dealer shall receive documentation that the pre-authorized transfer occurred and the amount of the transfer by notice on an itemized receipt. Dealer understands that there is no charge for this service.<br><br>In the event the below bank account shall lack sufficient funds for any debit due to an erroneous credit, Dealer agrees that it will reimburse Westlake for the entire amount of the erroneous credit, including any reasonable collection expenses and attorneys' fees and costs, should Westlake be required to institute legal proceedings. Dealer is solely responsible for any overdraft charges or other fees that its bank may assess in connection with transfers initiated pursuant to this ACH Authorization Form. Westlake will not be liable for any incidental or consequential damages resulting from any ACH transaction it initiates pursuant to this ACH Authorization Form. Dealer will remain liable for all amounts owed under the Agreement which remain unpaid as a result of an unsuccessful attempt to withdraw funds from the account below. Dealer is bound by NACHA guidelines as in effect from time to time.<br><br>THIS AUTHORITY SHALL REMAIN IN FULL FORCE AND EFFECT UNLESS AND UNTIL WESTLAKE HAS RECEIVED TEN (10) DAYS' WRITTEN NOTICE FROM DEALER OF TERMINATION OF THIS AGREEMENT, OR UNTIL WESTLAKE TERMINATES THIS AGREEMENT UPON TEN (10) DAYS' WRITTEN NOTICE TO DEALER. |

**PART 1. DEALER INFORMATION**

| Dealership Name:  MK AUTOMOTIVE, INC. | DBA: |
|---|---|
| Address:  8000 Park Blvd N, Pinellas Park, FL 33781 | |
| Dealer Code:  5464163 | Dealership Contact Name:  Michael Kastrenakes |
| Dealership Contact Phone:  (727) 423-1913 | Dealership Contact E-mail:  mukek@newwaveautosales.com |

**PART 2. BANK ACCOUNT INFORMATION**

| Bank Name:  Centerstate Bank | Name on Account: |
|---|---|
| Bank Account #:  ******** | Bank Routing #:  063116436 |
| Bank Address: | |

**PART 3. DEALER AUTHORIZATION**

The undersigned Dealer hereby authorizes Westlake to initiate entries to the above account and, if necessary, initiate adjustments for any transactions credited/debited in error. I understand and agree that this authorization will be subject to all terms and conditions as outlined in this document.

| *Michael Kastrenakes*<br>34CF137C4C77453... | Michael Kastrenakes    President | 11/28/20 |
|---|---|---|
| Dealer Signature | Name and Title | Date |

Initials _____ MK

## EXHIBIT G
## BORROWER'S PLACE OF BUSINESS

8000 Park Blvd N
Pinellas Park, FL 33781



Initials_____

Dealer No.:    5464163

Exhibit G: Borrower's Place of Business_03/2018

# EXHIBIT H
## RESERVE AGREEMENT

Borrower agrees to the institution of a Reserve for Lender Financed Inventory as a pre-condition and continuing requirement of the Note and other Loan Documents entered into by Borrower and Lender. The Reserve is outlined as follows: Borrower will remit a one-time initial deposit, which is listed below under the heading "Initial Deposit Amount" to Lender to serve as Offset Funds. Further, Borrower will remit a fixed deposit dollar amount, listed below under the heading "Per Unit Reserve," concurrently with each Advance for a Unit of Lender Financed Inventory to serve as additional Offset Funds. Collectively, the Initial Deposit Amount and the aggregate of all Per Unit Reserve amounts, each a Reserve Charge, shall constitute the Required Reserve Amount. The purpose of Per Car Reserve funds collected is to hold in trust, funds which will be only applied toward monies owed to Lender in the instance of default by Borrower under the Note and other Loan Documents. The continued obligation of Borrower to fund and maintain the Reserve is solely at the discretion of Lender. At any time, Lender may deem the reserve program either sufficient in terms of Offset Funds or unnecessary based on the merit of Borrower. In this instance, Lender, in its sole discretion, may release some or all of the Reserve to Borrower. Upon termination of Borrower's relationship with Lender, including the satisfaction of all of Borrower's Liabilities and Lender's reasonable belief that no further Liabilities will be incurred or accrue, Lender will release all Offset Funds, including the Reserve, to Borrower.

| Type of Program | Initial Deposit Amount | Per Unit Reserve |
|---|---|---|
| Reserve | $ | $ 100.00 |

MK AUTOMOTIVE, INC.

*Michael Kastrenakes*
—— 34CF137C4C77453...

By: _____
Name: Michael Kastrenakes
Title: President
Date: 11/28/2018 | 1:51:18 PM PST



Initials_____

## CORPORATE AUTHORIZING RESOLUTION TO BORROW OF

MK AUTOMOTIVE, INC.

a FL , Corporation

Pursuant to applicable state laws, the undersigned, being all of the board of directors of MK AUTOMOTIVE, INC. ("Corporation"), do hereby approve and consent to the following actions without a meeting, with the intention that such actions shall have the same force and effect as if passed at a meeting duly called and held:

**Execution of LSA and Loan Documents**

WHEREAS, the board of directors of the Corporation find that it is in the best interests of the Corporation to obtain a loan (the "Loan") with Westlake Flooring Company, LLC ("Lender") pursuant to that certain Promissory Note And Loan And Security Agreement dated 2018-11-28 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "LSA") and the Loan Documents as defined in the LSA, executed by Lender and Corporation; and

WHEREAS, the Loan will be secured by all assets as set forth in the LSA;

NOW, THEREFORE, BE IT RESOLVED, that the board of directors of the Corporation hereby approve the Loan and the Corporation's entering into the transactions contemplated by the LSA and the Loan Documents.

RESOLVED FURTHER, that the LSA and the Loan Documents, and the execution, delivery and performance thereof, are hereby ratified, confirmed and approved in all respects, and that Corporation's officers are authorized to consummate the transactions contemplated by the LSA and the Loan Documents and to cause the Corporation to perform all of its duties and obligations thereunder.

**Certification**

RESOLVED FURTHER, that the corporate Secretary is directed to certify this resolution and to deliver the certification in support of the authority of the officers named herein to act on behalf of this Corporation.

The following named individuals were designated and appointed to the positions indicated below, and that said person holds such positions at this time, and the signatures set forth opposite the names are genuine signatures.

OFFICERS:

| Name | Title | Signature |
|------|-------|-----------|
| Michael Kastrenakes | President | Michael Kastrenakes 34CF137C4C77453... |

DIRECTOR(s):

| Name | Director | Signature |
|------|----------|-----------|
| Michael Kastrenakes | Director | Michael Kastrenakes 34CF137C4C77453... |

We/I have read all the provisions of this Authorizing Resolution To Borrow, and we/I certify that all statements and representations made herein are true and correct. This Authorizing Resolution To Borrow is dated 2018-11-28

Michael Kastrenakes
34CF137C4C77453...
Michael Kastrenakes Director ,

Michael Kastrenakes
34CF137C4C77453...
Michael Kastrenakes President ,



# Westlake Quick Facts

Dealer acknowledges and agrees to all terms and conditions of the Loan And Security Agreement, including, each of the following:

## Rates & Fees
- Westlake Flooring Services charges fees and Dealer has reviewed the Westlake Rate & Fee Schedule.
- Curtailment fees are term plan period specific and are added on the 1st day of each term.
- Administrative fees may be charged relating to additional services provided to Dealer by Westlake such as highline advances, outside of auction purchases, and temporary and permanent line of credit increases.
- Highline Fees: Fees will be charged to units that exceed $25,000.
- Overlines: The credit line may not exceed 100% of the approved limit. If for any reason Dealer exceeds this limit a 2% fee will be applied to the amount over the credit approved.
- Dealer is responsible for scheduling its payments. Late fees will be incurred in the event of late payments.
- Auction purchases must be submitted within 7 days of purchase date. If received outside of 7 days, the unit will be considered an outside floor and incur charges.
- Interest is calculated on the basis of a 360-day year for actual days elapsed and consists of the Base Rate and Applicable Rate.
- Dealer can receive reductions in the Applicable interest rate based upon the volume of business with Westlake Financial Services.

## Inventory Audit
- All inventory shall be stored at Dealer's place of business, or checked in at a registered auction.
- Audits will be conducted twice monthly for the first 6 audits. If all audits are of passing quality, Dealer may request to be put on monthly audits.
- Dealer shall not use inventory as loaners.
- Audits fees are paid by the Dealer.
- Any vehicle off the lot the time of the audit must be reconciled within 24 hours.
- If auditor must drive over 10 miles for vehicle verification an additional audit fee will be assessed (i.e. storage location or body shop).
- Dealer must provide acceptable contracts/bills of sale that must include valid sold dates and valid signatures of dealer and customer.
- Unreconciled units are subject to additional charges.

## Account Status
- If there is a significant change in the business (i.e. ownership, location, etc.), Dealer must notify Westlake prior to the change occurring.
- Accounts will be put on hold due to breaches of Dealer obligations, including but not limited to:
- Delinquency
- Failed or aged audits
- Expired licenses or insurance
- NSF payments
  - NSF's will cause the Dealer account to be put on hold. Title release privileges will also be changed due to the NSF.

## Use of Loan Proceeds
- Westlake does not floor units that have an MMR value under $3,000 or are more than 20 years old.
- The floorplan shall not be used to finance salvage or branded units, wrecked units, inoperable units, flood-damaged units, personal watercraft, Canadian imports, gray market cars, motorcycles, scooters, trailers, kit cars, snowmobiles, wreckers, ATVs, limousines, RVs, buses, boats, collector or classic cars, rentals or golf carts.
- The maximum advance cannot exceed $50,000 for a single floorplan transaction.
- Dealer is limited to using up to 25% of their credit line towards outside floors. Westlake will value the unit using MMR (Manheim Market Report), any excess amount will be covered by the dealer.



# Westlake Quick Facts

Payments; Net Funding

- Dealer is responsible for managing its account, and should be logging in daily. Log-ins provided will allow access to www.wfsdealers.com. Dealer can also use the WFS mobile app to review its account and schedule payments.
- All vehicles loans are due to be paid off within 24 hours of the receipt of funds for the vehicle or 7 days of the sale date, whichever comes first. NOTE: Cash is not accepted.
- Proceeds for units funded by Westlake Financial Services that are floored with Westlake Flooring Services will be used to pay off the flooring debt. Overages will be deposited into my account.
- Upon payoff, titles are sent out via an overnight delivery service. Westlake does not send titles via regular mail.

I acknowledge and agree with each of the foregoing provisions and those set forth in further detail in the Loan And Security Agreement.

*Michael Kastrenakes*

34CF137C4C77453...

11/28/2018 | 1:51:18 PM PST
_____
Date

Name:    Michael Kastrenakes

Title:    President

DocuSign Envelope ID: B5DF1FA5-5FFD-4F5E-B9D3-420442E23CC0

### STANDARD DEALER: FEES AND RATES SCHEDULE

1.   Loan Fees:

| | | |
|---|---|---|
| (a) | Administrative Fee (per Vehicle) | $15 |
| (b) | Late Fee (per delinquent Advance) | $75 |
| (c) | NSF Fee | $100 |
| (d) | Overline Fee(% of amount in excess of Advance Availability) | 2% |
| (e) | Highline Fee (per Vehicle Advance in excess of $25,000) | $150 |
| (f) | Outside Flooring Fee | $60 |
| (g) | Trusted Title Fee | $25 |
| (h) | Shipping | |
| | (i) Overnight | $0 |
| | (ii) Priority Overnight | $25 |
| | (iii) Saturday Delivery | $35 |
| (i) | Manual Payment Fee | $15 |
| (j) | Loan Payoff Fee | $100 |
| (k) | Extension Fee | $150+Term Fee |
| (l) | Temporary Increase | 1% of increase amount |
| (m) | Sign-up Fee | $130 |

2.   Audit Fees:

| | | |
|---|---|---|
| (a) | Audit Fee (per location) | $90 |
| (b) | Vehicle Not Found (per Vehicle)[*] | $100 |
| (c) | Audit Lot Revisit (per location) | |
| | (i) Locations 6 – 15 mi from the dealership | $55 |
| | (ii) Locations 15mi or more from the dealership | $90 |
| (d) | Sold out of Trust(Per Vehicle)* | $100 |
| (e) | Virtual Audit Fee | $50 |

3.   Contract Rate:                                    3.25%

4.    Base Rate:                                        5.75%

*- Lender's charging this fee shall not constitute a waiver of any rights of Lender under the Agreement.

## EXHIBIT D
## INSURANCE REQUIREMENTS

Borrower shall, at all times, regardless of whether Borrower acquires insurance on its own, through Lender's Inventory Protection Program, or is automatically enrolled in Lender's Inventory Protection Program (force placed) for failure to acquire or maintain insurance, comply with the following requirements:

1. Comprehensive Insurance in an amount no less than 50% of the Credit Line, with a deductible of no more than (a) $750 per Unit of Lender Financed Inventory and per occurrence if provided by Knight Insurance; or (b) $1,000.00 per Unit of Lender Financed Inventory and per occurrence deductible if provided by another insurer that is acceptable to Lender.

2. Collision Insurance with a deductible of no more than (a) $750 per Unit of Lender Financed Inventory if provided by Knight Insurance; or (b) $1,000.00 per Unit of Lender Financed Inventory if provided by another insurer that is acceptable to Lender.

3. Garage Insurance. Borrower shall obtain and keep in effect garage insurance and liability coverage at or above the minimum amount required by the state in which it is located.

4. Loss Payee. Lender shall be the loss payee for all insurance policies, and shall be specified as:

Westlake Flooring Company, LLC
4751 Wilshire Blvd., Suite 100
Los Angeles, CA 90010

5. Insurance Carriers. Insurance carriers shall have an AM Best's Policyholder's rating of not less than "A-" and a class size of not less than "VI."

6. Notice of Cancellation. Lender shall receive direct written notice from each applicable carrier at least thirty (30) days prior to any cancellation or non-renewal of any of the above-mandated policies.

These Insurance Requirements are subject to change by Lender, within Lender's sole discretion, under the terms of this Note and the other Loan Documents.



Initials_____

## DEALER FLOOR PLAN INSURANCE APPLICATION FLORIDA

| Dealer Name and Principal Address<br><br>**MK AUTOMOTIVE, INC.**<br>8000 Park Blvd N<br>Pinellas Park, FL 33781 | Dealer ID Number: 5464163<br><br>Dealer Phone: (727) 423-1913<br><br>Dealer Principal Contact: Michael Kastrenakes | Effective Date of Coverage:<br><br>Policy incepts upon the Dealership accessing the credit line AND the Creditor advancing funds pursuant to the established credit line. |
|---|---|---|

Business Entity Type: Incorporation

Flooring Credit Line: $ $500,000

**Average Radius** of Vehicle Auctions for purchased vehicles Pickup: _____ Miles

### SCHEDULE OF LOCATIONS

| LOCATION | STREET | CITY | STATE | ZIP CODE | PHONE |
|---|---|---|---|---|---|
| 1.   Main | 8000 Park Blvd N | Pinellas Park | FL | 33781 | (727) 423-1913 |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

Program charges are billed at an annual rate of 7.5% on the original balance.

**Example of Program Charges**
Original Principal Balance = $10,000.00

| Period | Percentage | Charge |
|---|---|---|
| **Annual** | 7.5% | $750.00 |
| **Monthly** | 0.625% | $62.50 |
| **Daily** | 0.021% | $2.08 |

**Underwriting Information**

Please provide your last 3 years of your Dealer Open Lot losses.

How many theft and repairable Dealer Open Lot claims has your dealer had in the past 3 years:

Please explain what type of security measures are taken at your dealer location during afterhours to prevent theft (Ex. Fence all around your lot, locked gate, security cameras/dogs, etc.):

The undersigned is an **authorized representative of the applicant** and represents that reasonable inquiry has been made to obtain the answers to questions on this application. The applicant(s) *represents* that the answers are true, correct and complete to the best of their knowledge and belief.

| DocuSigned by:<br>*Michael Kastrenakes*<br>34CF137C4C77453... | | 11/28/2018 | 1:51:18 PM PST |
|---|---|---|
| Applicant(s) Signature(s) | | Date |
| Producer/Agent Signature | Producer/Agent Name (please print) | State Insurance License Number |

**KnightBrook Insurance Company**
**4751 Wilshire Blvd**
**Los Angeles CA 90010**

| **Fraud Notices** |
| --- |

**NOTICE TO ALASKA APPLICANTS:** A person who knowingly and with the intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information is guilty of a crime.

**NOTICE TO ARKANSAS APPLICANTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance may be guilty of a crime and subject to fines and confinement in prison.

**NOTICE TO CALIFORNIA APPLICANTS:** For your protection California law requires the following to appear on this form. Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in prison. Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**NOTICE TO DELAWARE APPLICANTS:** Any person who knowingly, and with the intent to injure, defraud or deceive an insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO DISTRICT OF COLUMBIA APPLICANTS:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, any insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**NOTICE TO FLORIDA APPLICANTS:** Any person who knowingly, and with the intent to injure, defraud or deceive any insurance company files a statement of claim containing any false, incomplete or misleading information is guilty of a felony of the third degree.

**NOTICE TO HAWAII APPLICANTS:** For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punish able by fines, imprisonment or both.

**NOTICE TO IDAHO APPLICANTS:** Any person who knowingly, and with the intent to defraud or deceive any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO INDIANA RESIDENTS:** A person who knowingly and with the intent to defraud an insurer file a statement of claims containing any false, incomplete or misleading information commits a felony.

**NOTICE TO KENTUCKY APPLICANTS:** Any person who knowingly and with the intent to defraud an insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**NOTICE TO LOUISIANA MAINE AND TENNESSEE APPLICANTS:** Any person who knowingly and with the intent to defraud any insurance company or another person, files a statement of claim contain any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, subject to criminal prosecution and civil penalties. Insurance benefits may also be denied.

**NOTICE TO MINNESOTA APPLICANTS:** A person who submits an application or files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**NOTICE TO NEVADA APPLICANTS:** Pursuant to NRS 686A.291, any person who knowingly and willfully files a statement that contains any false, incomplete or misleading information concerning a material fact is guilty of a felony.

**NOTICE TO NEW HAMPSHIRE APPLICANTS:** Any person who, with the purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**NOTICE TO NEW JERSEY APPLICANTS:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**NOTICE TO NEW MEXICO APPLICANTS:** Any person who knowingly presents a false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**NOTICE TO OHIO APPLICANTS:** Any person who, with the intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO OKLAHOMA APPLICANTS:** WARNING: Any person who knowingly and with the intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of a n insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO PENNSYLVANIA APPLICANTS:** Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact thereto commits a fraudulent insurance act, which is a crime and subjects such a person to criminal and civil penalties.

**NOTICE TO VIRGINIA APPLICANTS:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefit.

Date: 2018-11-28

GRANDSOUTH BANK
381 HALTON ROAD
GREENVILLE, SC 29607

RE: Cancellation of Credit Line of   MK AUTOMOTIVE, INC.                  and Request
to Terminate UCC Financing Statement


To whom this may concern:

This letter is to request that you cancel   MK AUTOMOTIVE, INC.                  's   line   of
credit with your company and cause your financing statement to be terminated releasing your
blanket security interest in the collateral of   MK AUTOMOTIVE, INC.                  .

Please provide a copy of the filed Termination to Westlake Flooring Services at the following
address:

      Westlake Flooring Company, LLC
      4751 Wilshire Boulevard
      Suite 100
      Los Angeles, CA 90010

Sincerely,

  MK AUTOMOTIVE, INC.

Signature: _____

Name: _____
      Michael Kastrenakes

Title: _____
      President

Dealer Address:

 8000 Park Blvd N
 Pinellas Park, FL 33781


VIA CERTIFIED MAIL
#_____

**Dealer Name:**    MK AUTOMOTIVE, INC.        (  5464163  )

## Westlake Flooring Services Summary Sheet



## CREDIT SUMMARY

| CREDIT LINE | TERMS | | | PCR | INTEREST RATE |
|---|---|---|---|---|---|
| $500,000 | 60/30/30 | 5%/5%/100% | $80/$55/$55 | $ 100.00 | 9.00 % |

## FLOORING CONTACTS

| TEAM | NAME | PHONE NUMBER | EMAIL |
|---|---|---|---|
| Dealer Services (8am ~ 5pm PST, Monday ~ Friday) | | 855-493-8357 | dealers@wfs-flooring.com |
| Area Manager | Summer Reese | | sreese@wfs-flooring.com |

## ACCOUNT MANAGEMENT SYSTEMS

| WEBSITE | USERNAME | MOBILE APP DOWNLOAD |
|---|---|---|
| www.wfsdealers.com | 5464163-MK | |

## CUTOFF TIMES

| TIME | CATEGORY | BUSINESS PROCESS |
|---|---|---|
| 2:00 PM PST | Titles | to have title sent out same day, trusted or scheduled payoff |
| 4:00 PM PST | Extensions | to have extensions approved |
| 6:00 PM PST | ACH Payment | to avoid any late fees |

## IMPORTANT FEES

| FEE | APPLIED WHEN | AMOUNT |
|---|---|---|
| Audit Fee | For each audit, charged on the beginning of next month | $ 90 |
| Extension Fee | A 30 day extension is approved | $ 150 Plus a Term Fee |
| Late Fee | Payments not received by the cutoff time on the due date | $ 75 |
| SOT Fee | Additional late fee for sold units | $ 100 |
| NSF Fee | Payments bounced from the Bank (Payer's fault) | $ 100 |

Area Manager Initials                                                    Dealer Initials

**Dealer Name:**   MK AUTOMOTIVE, INC.   (   5464163   )

## Westlake Flooring Services Summary Sheet



### AUDITS

- Two audits per month for the first three months.
- 24 hours to reconcile audit or additional fees will be added.
- Vehicles are due 7 days from sold date or 24 hours from being funded, whichever comes first to avoid late and SOT fees.
- Westlake financed vehicles are due 14 days from sold date.
- Units missing for three audits in a row must be paid off.

### DEALER PERFORMANCE SCORE

- Factors include on-time payment percentage and audit scores.
- Must maintain a score of 70 or higher not to be considered underperforming.
- Requests (ex. Extensions, trusted titles etc.) will be impacted when score falls below 65.

### AUCTION AND OUTSIDE FLOORS

- All purchases must be submitted within 7 days of purchase date.
- If floored 7 ~ 14 days after the purchase date, a $60 fee will be incurred.
- If floored 15 ~ 21 days after the purchase date, a $90 fee will be incurred.
- No Units over 20 years older are floored
- No Units under $2,000; Maximum advance on vehicle is $35,000
- No Branded Titles

### ALL OUTSIDE FLOORS

- Up to 25% of approved credit line.
- Lower of 90% MMR or vehicle cost if funding to the dealer.
- Lower of 100% MMR or vehicle cost if funding an authorized third party.
- $60 Outside Flooring fee.
- Photo verify by providing pictures of all 4 sides of the vehicle, VIN and odometer. All photos must include Code-Of-The-Day.
- **Title cannot be in the dealer's name as register owner or lien holder on record**

### WESTLAKE FINANCE BENEFITS

- Westlake Floored and Financed deal will credit the dealer $100 on the deal and Westlake Flooring will waive up to $75 on their term fee.
- Westlake deals that fund in the current month will lower the floor plans interest rate by .5% for floored units and .25 % for non-floored units for the following month.

Area Manager Initials 

Dealer Initials